JOSEPH H. HARRINGTON
Acting United States Attorney
Eastern District of Washington
Caitlin Baunsgard
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | 2:17-CR-00067-SMJ |
| Plaintiff, | |
| vs. | United States' Motion for Reconsideration and Re-Opening of Suppression Hearing |
| CARLOS TORRES MEDRANO, JR., | |
| Defendant. | |

Plaintiff, United States of America, by and through Joseph H. Harrington, Acting United States Attorney, for the Eastern District of Washington, and Caitlin Baunsgard, Assistant United States Attorney for the Eastern District of Washington, submits the following motion for Reconsideration of Court's Ruling on Defendant's Motion to Suppress and/or Re-Opening of the Evidentiary Hearing.

The United States recognizes that Motions for Reconsideration are disfavored and limited in length under LCrR 12(c)(5). However, the United States respectfully submits that the issues in this case – suppression and witness credibility – are significant and worthy of reconsideration and/or re-opening of the hearing.

**INTRODUCTION**

Motion for Reconsideration and Re-Opening of Suppression Hearing - 1

On September 5, 2017, and September 6, 2017, this Court presided over an evidentiary hearing on the Defendant's Motion to Suppress Evidence. (*See* ECF Doc. No. 34 and 35). During the evidentiary hearing, the United States presented testimony from Spokane Police Department ("SPD") Officer ("Ofc.") Brooks and Washington Department of Corrections ("DOC"), Community Corrections Officer ("CCO") Taylor. The Defendant presented his own testimony and the testimony of his girlfriend, Ms. Cannon. At the conclusion of the hearing, without the benefit of the transcript, (*see* Attachment A), or the corroborating documentation also attached herewith, (*see* discussion *infra*), this Court made credibility findings by way of oral ruling and thereafter suppressed the evidence of firearms and multiple controlled substances located during a DOC search of a vehicle the Defendant was driving on March 28, 2017. This Court's oral ruling was memorialized in a written Order. *See* ECF Doc. No. 56 (filed September 20, 2017).

Upon review of the Court's oral ruling and written Order, the United States respectfully requests reconsideration of its credibility findings. The United States respectfully submits that much of the confusion that occurred during the hearing was, as evidenced by the transcript of the hearing, not the result of a deliberate attempt to mislead the Court, but a lack of detailed inquiry of the witnesses by the United States and defense counsel. While the Court may ultimately come to the same conclusion concerning the "reasonable cause" determination and ultimate suppression of the evidence, the United States urges this Court to reconsider its credibility findings.

In terms of the "reasonable cause" determination, the Court's Order states:

> If Officer Taylor had known Mr. Medrano had nearly $4,000 in his pocket, and if the safe in the front seat had not been in its store packaging, this would be an easy case.

(*See* ECF Doc. No. 56, pg. 19). The conclusion to be drawn from this statement is that if Officer Taylor *knew* the exact amount of cash in the Defendant's pocket and

Motion for Reconsideration and Re-Opening of Suppression Hearing - 2

had testified that the safe observed in the front seat of the vehicle was in a cardboard box *that was open at the top making the safe clearly visible* – as the Defendant testified on cross-examination – the DOC search would have been justified under a "reasonable cause" standard.

The more pressing concern of the United States, however, is this Court's adverse credibility finding of these law enforcement witnesses. Respectfully, while the testimony was far from perfect, and at times incorrect, the United States submits that the actual transcript and supporting exhibits to this motion do not support a conclusion that the witnesses deliberately sought to mislead the Court concerning either the facts and circumstances of the stop and search or the conclusions the witnesses drew from those fact and circumstances based on their training, experience, and personal knowledge at the time of the incident. Accordingly, the United States respectfully requests reconsideration of this Court's ruling or re-open the hearing to allow the United States to present extensive, corroborative exhibits in support of the witnesses' testimony on the points the Court has drawn into question.

## DISCUSSION

I.     THE REASONABLE CAUSE DETERMINATION:

    A. <u>Testimony of SPD Ofc. Brooks, DOC CCO Taylor, and the Defendant:</u>

As noted, *supra*, this Court's written Order suggests that if there had been testimony concerning the exact amount of cash in the Defendant's pocket, and if the safe had not been in its retail cardboard box, the Court would have found "reasonable cause" supporting the DOC search and not suppressed the evidence. (*See* ECF Doc. No. 56, pg. 19). While the Court's suppression ruling may ultimately not change by way of the instant motion, the United States' concern is the Court's comments about testimony concerning the money, the safe, and the witnesses' recollection.

First, in reference to the money in the Defendant's rear pant pocket, the Court appears to question SPD Ofc. Brooks' testimony, suggesting that SPD Ofc. Brooks

Motion for Reconsideration and Re-Opening of Suppression Hearing - 3

had omitted the fact that he did not know the exact amount until the Court inquired. The Order states:

> Officer Brooks did not initially testify to the amount of cash in the bundle. When asked by the Court, Officer Brooks acknowledged he did not count the money at the scene.

*See* ECF Doc. No. 56, pg. 6 (emphasis added).  In footnote 8, the Court states:

> Officer Brooks again omitted that he did not know the actual amount of money, leaving the Court with the initial impression that he had conveyed some an [sic] amount or estimation of an amount to Officer Taylor.

*See* ECF Doc. No. 56, pg. 8, n.8.

A review of the transcript of the hearing shows, <u>prior</u> to the Court's inquiry, the following colloquy occurred between counsel and SPD Ofc. Brooks:

> Q    Okay. And did you search his person instant to arrest?
> A    Yes.
> Q    And did you locate anything of significance to you?
> A    Yes. Um, his first pocket I went into, I pulled out, uh -- I'm not sure because <u>I never counted it at the scene</u>, but several, uh, bills of different denominations. And then continuing the search, in another pocket he had a bundle of cash in different denominations wrapped in two black rubber bands.
> Q    And was the wrapping of this currency or those rubber bands of significance to you?
> A    Yeah, it is. The -- the, uh -- the amount, <u>not knowing how much it was but looks like a good amount of cash</u> being wrapped in rubber bands is consistent, through my training and experience, to be associated with drug trafficking and selling he was in, um, of that nature.

*See* Attachment A, pgs. 18-19 (emphasis added).

In response to the Court's further inquiry about the money, SPD Ofc. Brooks explained:

> THE COURT:    Right.

Motion for Reconsideration and Re-Opening of Suppression Hearing - 4

> What information, specific information did you provide to Officer Taylor -- I believe that's the probation officer; that's correct?
>
> THE WITNESS: Yes.
>
> THE COURT: -- in regards to what was found in your search?
>
> THE WITNESS: In my search? That he had a large sum of money on him.
>
> THE COURT: Did you specify how much money that was?
>
> THE WITNESS: No, I didn't -- did not count his money.
>
> THE COURT: Right. I understand you didn't count it. But did you specify to him what you -- what amount of money that was?
>
> THE WITNESS: No.

*See* Attachment A, pgs. 38-39 (emphasis added). DOC CCO Taylor's testimony is consistent:

> Uh, Mr. Brooks called me, uh, roughly 10 o'clock in the morning and advised me that he had, uh, Carlos Medrano under arrest, um, for, um, driving while license suspended. He also indicated that Mr. Medrano was driving a car that wasn't associated with him, which was out of character; and when he took Mr. Medrano into custody, um, Mr. Medrano had quite a large sum of cash in one of his pockets.

*See* Attachment A, pgs. 47 (emphasis added). Later in his testimony, DOC CCO Taylor twice indicated that he had been advised by SPD Ofc. Brooks that it was a "large sum" or "large amount" of money – but indicated that he was not advised of the actual amount. *See* Attachment A, pg. 55, 58 (direct); *see also* Attachment A, pg. 61 (cross-examination). The concern of the Court appears to be that no one testified to knowing the actual amount. However, both CCO Taylor and SPD Ofc. Brooks used terms like "large" amount, which was significant to them based on their training and experience. While after-the-fact information that the cash (once counted) was approximately $3,273, does not change the fact that it was that it was a "large" amount – and SPD Ofc. Brooks and  DOC CCO Taylor's testimony was consistent on

Motion for Reconsideration and Re-Opening of Suppression Hearing - 5

this point (based on SPD Ofc. Brooks' training and experience, and his statement to DOC CCO Taylor).

Plainly, the Court must decide how much weight to give such evidence.[1]  In its oral ruling, the Court stated:

> Well, <u>it turns out that Officer Taylor did not know how much money Mr. Medrano had in his pocket</u>. All he knew was it was

[1] The written Order provides: "The fact that a person chooses to carry money in a roll—as opposed to in a wallet, money clip or some other means—is not, in and of itself, suspicious." *See* ECF Doc. No. 56, pg. 19.  While the method of carrying or possessing cash may be an innocuous fact in isolation, and ultimately not suspicious to the Court, it was "significant" to SPD Ofc. Brooks at the time.  Furthermore, the Court cannot isolate facts from the analysis and discount them as possibly innocent conduct.  *See United States v. Arvizu,* 534 U.S. 266, 274 (2002).  The testimony was:

> Q    Okay. And did you search his person instant to arrest?
> A    Yes.
> Q    And did you locate anything of <u>significance to you</u>?
> A    Yes. Um, his first pocket I went into, I pulled out, uh -- I'm not sure because I never counted it at the scene, but several, uh, bills of different denominations. And then continuing the search, in another pocket he had a bundle of cash in different denominations wrapped in two black rubber bands.
> Q    And was the wrapping of this currency or those rubber bands of <u>significance to you</u>?
> A    Yeah, it is. The -- the, uh -- the amount, not knowing how much it was but looks like a good amount of cash being wrapped in rubber bands is consistent, through my training and experience, to be associated with drug trafficking and selling he was in, um, of that nature.
> Q    And do you have personal experience arresting or searching drug traffickers who have that type of bundled currency on them?
> A    Yes.

*See* Attachment A, pgs. 18-19.

Motion for Reconsideration and Re-Opening of Suppression Hearing - 6

> a large wad of money that was wrapped in a rubber band. That could have been $400, could have been $200, could have been a thousand, and it could have been $3,500, as it was in this case. <u>But the fact is he didn't know because Officer Brooks never told him.</u>

*See* Attachment A, pg. 166 (underlining added). Notwithstanding the consistent testimony from SPD Ofc. Brooks and DOC CCO Taylor – that they did not know the actual amount but a "large" sum was significant to SPD Ofc. Brooks and specifically to DOC CCO Taylor (as Defendant had been out of work) – the Court indicated that the actual amount was approximately $3,273. *See* ECF Doc. No. 56, n.5. In the Court's view, it appears that the statement that it was a "large" amount was too ambiguous to credit toward a reasonable cause finding. To conclude, however, that the officers deliberately sought to mislead the Court as to the amount by omitting testimony as to the exact amount, is difficult to reconcile with the logical inference drawn from the facts. First, the officers did not count it. *See, supra.* Second, if they had counted it and it consisted of 37[2] one-dollar bills, but did not advise the Court of this fact, then the term a "large" amount would in fact be misleading. Third, if they had counted it and advised the Court that it totaled $3,273, according to both this Court's written Order, (*see* ECF Doc. No. 56, pg. 19), and oral ruling, (*see* Attachment A, pg. 167), the "reasonable cause" argument would have been stronger. At least one of the officers would have known the exact amount of cash that was in the Defendant's pocket between the vehicle search and the hearing – how else would the Court have the information. Such information, however, would have been gleaned only <u>after</u> the vehicle search occurred and, thus, would not be relevant to the threshold decision to conduct the vehicle search. Arguably, to provide such after-the-fact

---

[2] The minimum amount of Federal Reserve Notes in denominations of $100 or less to aggregate to $3,273 is 37.

Motion for Reconsideration and Re-Opening of Suppression Hearing - 7

knowledge *would* have been objectionable as possibly misleading to the Court. In its written Order, however, the Court appears to characterize the testimony of SPD Ofc. Brooks, specifically: "I never counted it at the scene[,]" (*see* Attachment A, pg. 18) as an "omission of the fact that the officers did not know how the amount of money[,]" and, based on the characterization of the testimony as an omission, states that it "is very concerning, and raises questions about the reliability of their testimony." *See* ECF Doc. 56, pg. 17. Respectfully, the transcript of the testimony belies any misperception about whether SPD Ofc. Brooks or DOC CCO Taylor actually knew the amount of money at the time of the vehicle search; the transcript should dispel the Court's concerns about the officers' reliability on this subject.

In reference to the safe observed on the front seat of the vehicle, the Court appears to rely heavily on the fact that the safe was in its "retail packaging." *See* ECF Doc. No. 56, pg. 7, n. 6 (noting that SPD Ofc. Brooks "omitted th[is] important fact"); *see also* ECF Doc. No. 56, pg. 10, n.9 (noting that DOC CCO Taylor "omitted that the safe on the front seat was still in its retail packaging"). In its written Order, the Court states:

> The safe on the front seat provided the second strongest basis of support. After hearing the testimony of both Officer Brooks and Officer Taylor, the Court was under the misimpression that Officer Taylor and Officer Brooks could see a gray safe on the front passenger seat, and that when Officer Taylor searched the vehicle, he found that *the same safe* contained methamphetamine, guns, a scale, and drug residue. But the Court later learned from Mr. Medrano's testimony that, in fact, there were two safes, and that the safe on the front seat—the only one visible from outside the car—was in its retail packaging. Further, when the car was searched, that safe on the front seat was empty. The guns and narcotics were found in a second safe that was hidden from view.

*See* ECF Doc. No. 56, pgs. 17-18 (italics in Order) (emphasis added). In its oral ruling, the Court stated:

Motion for Reconsideration and Re-Opening of Suppression Hearing - 8

Then we get to the testimony about the safe being in the front seat. Now, the first time both Officer Brooks and Officer Taylor testified they said, oh, there's this safe that's in the front seat. Again, reading the briefs, I'm thinking: Why are we here? Well, what both Officer Brooks and Officer Taylor didn't say in their opening testimony was the fact that this safe was in a cardboard box with the sticker still on it, having just been bought at a store.

Now, is that unusual? I don't think so. People who buy things sometimes carry them in the front seat, still in their packaging.

But the way in which Officer Taylor testified and Officer Brooks finished their testimony, left, didn't once mentioning that, in fact, this box -- this safe was in the box. Instead, they testified, specifically Officer Taylor, that he brought out the safe, opened it up, and had guns and drugs in it; opened it up and showed that to Officer Brooks, again, leaving the Court with a misimpression that, in fact, this was the same safe, never mentioning the fact that there was a second safe that was hidden behind the front passenger seat.

*See* Attachment A, pgs. 167-168.

Plainly, SPD Ofc. Brooks' testimony concerning the location of drugs and firearms in the front-seat safe – as opposed to the second, secreted safe – was incorrect.[3] SPD Ofc. Brooks clarified he was not present for the DOC search. He was

---

[3] It should be noted that in its oral ruling, the Court indicates that "they testified, specifically Officer Taylor, that he brought out the safe, opened it up, and had guns and drugs in it." *See* Attachment A, pg. 168. The testimony from DOC CCO Taylor, however, based on his "recollection," was that "Officer Long pulled the safe out, handed it to me[.]" *See* Attachment A, pg. 65. Now, there is no way of knowing whether DOC CCO Taylor thought it was the same safe at the time – having not pulled it from the vehicle as the Court stated. As for SPD Ofc. Brooks, he did not assist in the DOC search of the vehicle. *See* Attachment A, pg. 27. Therefore, there is no reason to conclude that <u>at the time</u> of the incident, he didn't think that the drugs

Motion for Reconsideration and Re-Opening of Suppression Hearing - 9

only aware of what CCO Taylor shared with him from the DOC search, *i.e.* a safe with drugs and guns. The Court notes this as a "valuable piece of information"[4] that was cleared up by the Defendant. *See* Attachment A, pg. 168.

The Defendant's testimony is indeed telling concerning the front-seat safe. Upon review of the transcript, even the Defendant did initially indicate that the safe was in a box, (*see* Attachment A, pgs. 95-96, 98), it was not until the Court's inquiry and much later during cross-examination, that the Defendant stated that "the top of the cardboard was open so you could see the safe, but it was in the box." *See* Attachment A, pg. 106). Counsel for the United States followed up:

---

and firearms were in the front-seat safe. However, the fact that there was a second safe secreted inside the vehicle, and that second safe actually contained the drugs and firearms, even though irrelevant to this issue before the Court could easily have been explained at the hearing. Notwithstanding the incorrect testimony, however, whatever was hidden from sight inside the vehicle is not relevant to the reasonable cause determination. DOC CCO Taylor later clarified when asked which safe contained the firearms and controlled substances.

[4] Again, the Court may properly place any weight it chooses on the evidence presented. It should be noted, however, that not only were SPD Ofc. Brooks and DOC CCO Taylor *not* asked about the safe being in a cardboard box during direct, neither witness was asked about this fact on cross-examination. This suggests that even defense counsel did not consider this information significant enough to inquire. One would assume at a suppression hearing, in which the issue is what the officers observed, defense counsel would have attempted to illicit testimony on cross that the safe was not visible – unless his client, the Defendant, had already advised him that it was visible.

Motion for Reconsideration and Re-Opening of Suppression Hearing - 10

> Q    Sir, when you said that the safe was in a -- in a cardboard box in the passenger seat, what images were displayed on the exterior of that box?
>
> A    It was the manufacturer's box that the safe comes in.  I bought it the night prior, so it was just the picture of the safe, and it would say like things about the coverage space and what's inside and –
>
> Q    And did you indicate that <u>the cardboard on the top of that box was opened</u>?
>
> A    <u>It was</u>.
>
> Q    So <u>you could see that it was, in fact, a safe in that box</u>?
>
> A    <u>Yes</u>.

*See* Attachment A, pg. 107 (emphasis added).

In short, the Defendant's own testimony corroborated that the officers could see a safe – not just a cardboard box that possibly contained a safe – because the box was open.  Arguably, this is additional, valuable information because SPD Ofc. Brooks testified to what he observed:

> Um, I didn't open the vehicle; I didn't touch the vehicle; I looked in it. <u>I saw on the passenger seat a safe</u>, um, on the passenger seat of the vehicle.

*See* Attachment A, pg. 21 (emphasis added).  Nowhere in either its oral ruling or its written Order does the Court reference the Defendant's clear acknowledgment that the safe was visible because the top of the cardboard, retail packaging was open.  Indeed, in its oral ruling, the Court stated that the cardboard box was "surrounding" the safe. *See* Attachment A, pg. 171.  The written Order states:

> The safe on the front seat provided the second strongest basis of support. After hearing the testimony of both Officer Brooks and Officer Taylor, the Court was under the misimpression that Officer Taylor and Officer Brooks <u>could see a gray safe</u> on the front passenger seat[.]

*See* ECF Doc. No. 56, pgs. 17-18.

The visibility of the safe should have been cleared up by the Defendant's corroborating, and arguably reliable, testimony.  In essence, a closed box can contain anything – or nothing.  An open box, however, can allow an observer to *confirm* the

Motion for Reconsideration and Re-Opening of Suppression Hearing - 11

contents. If SPD Ofc. Brooks was in fact able to accurately observe a safe on the front passenger seat of the vehicle by virtue of the open lid of the cardboard retail packaging, as the Defendant testified, then it appears that the reason that the observation of the safe does not factor into reasonable cause determination in the Court's opinion is that is that it was in its retail box. *See* ECF Doc. No. 56, pg. 19 (noting in addition to possibly knowing the actual amount of money the Defendant possessed, "if the safe in the front seat had not been in its store packaging, this would be an easy case[,]" and concluding that because "the safe visible in the car was in retail packaging[,]" it is a factor that is "not a basis for reasonable cause"). The concern in terms of the officers' credibility is simple. The Court's Order suggests that the officers somehow fabricated that fact that they could see the safe. If this were true, it would be of significate concern. The Defendant's own testimony, however, dispels any such concerns. In short, their testimony was corroborated by the Defendant. It lacked the detail of the cardboard box, but the fact that they could see the safe is accurate.

Again, the Court may properly weigh the evidence as it presented and as it factors into the particular standard at issue: here, reasonable cause. The Court cannot remove this factor from the "reasonable cause" analysis. *See Arizu,* 534 U.S. at 274. Both CCO Taylor and SPD Ofc. Brooks testified the presence of a safe is of significance to them because in their training and experience. DOC CCO Taylor further advised that it was the fact a safe was present, that was of significance to them. The Court's Order suggests that if only two factors were present, knowledge that the Defendant possessed \$3,273 (as opposed to a "large" amount) and if the visible safe was not in a cardboard box, the reasonable cause standard would have been *easily* met. *See* ECF Doc. No. 56, pg. 19.

The United States respectfully submits that in addition to the testimony from the United States' witnesses, the Defendant's own testimony, as well as the body

Motion for Reconsideration and Re-Opening of Suppression Hearing - 12

camera video footage justified the DOC search: (1) the Defendant confirmed he was on DOC supervision during testimony (*see* Attachment A, pg. 70); (2) the Defendant admitted to a lengthy drug possession history and heroin use *See* Attachment A, pgs. 70-71; (3) the Defendant indicated that he asked SPD Ofc. Brooks if he was "legally obligated" to give his name and only did after three times of refusing to provide his name because he thought he "would get in trouble," even though he testified, inconsistently, that he didn't recognized him as a police officer, but later testified that he did recognize SPD Ofc. Brooks as the police (*see* Attachment A, pg. 81); the Defendant was driving a vehicle that he said did not belong to him (*see* Attachment A, pg. 82); the Defendant admitted to having a wad of cash in his pocket and tried to come up with an excuse  (*see* Attachment A, pg. 86); the Defendant falsely[5] testified that the money came from selling a car (*see* Attachment A, pg. 87); the Defendant testified that the SPD officers looked into the vehicle without entering it (*see* Attachment A, pg. 90-91); the Defendant testified that he lied to the officers on scene about being on DOC supervision (*see* Attachment A, pg. 91); and the Defendant testified that there was a safe on the front seat of the vehicle. *See* Attachment A, pgs. 96, 98 (indicating on direct it was in a box but not that the top of the box was open), 106 (same on the Court's inquiry); *see also* Attachment A, pg. 107 (admitting on cross-examination that the top of the box was open and the actual safe was visible). Although the Court noted the Defendant's credibility issues, the conclusion was that "it was only [the Defendant] who, in fact, actually provided truthful information that was corroborated.[6]

---

[5] *See* Attachment A pg. 172 (During its oral ruling, this Court stated: "Now, do I believe for a minute that that money was from the sale of a car or from financial aid? No.")

[6] Arguably, much of the Defendant's truthful testimony is consistent with the testimony of SPD Ofc. Brooks and DOC CCO Taylor.

Motion for Reconsideration and Re-Opening of Suppression Hearing - 13

In addition to the testimony about the large amount of cash and the visible safe on the passenger seat of the vehicle, there was other testimony by SPD Ofc. Brooks and DOC CCO Taylor concerning additional factors that went into *their* reasonable cause determination. The Court's Order is ambiguous as to whether any of the other information provided by the witnesses factored in any way into the "reasonable cause" determination – or if the lack of knowledge concerning the actual amount of cash ($3,273) that comprised the "large" amount and fact that the safe, which was visible through the open top of the cardboard box, were deciding factors regardless of the rest of the testimony, which included: SPD Ofc. Brooks' observation of the vehicle in a high crime area and the Defendant appearing to be moving toward a "problem address" (*see* Attachment A, pgs. 12-13); SPD Ofc. Brooks' observation a vehicle with no front or rear license plate attached, which is a violation of Washington State law, driving in the opposite direction of travel  (*see* Attachment A, pg. 14); SPD Ofc. Brooks' testimony that he observed a male driver exiting the driver's seat and walking away from the vehicle and it "appeared" to Officer Brooks that the driver of the vehicle had noticed his patrol car and made a "quite hasty" left turn "probably to avoid detection"[7]  (*see* Attachment A, pg. 15); and SPD Ofc. Brooks' testimony that

---

[7] The Court also seems to attach a credibility determination to SPD Ofc. Brooks' lack of testimony that he did not turn on his lights and sirens or that his patrol vehicle was not "marked" until the Court posed the inquiry. (*See* Attachment A, pg. 170; *see also* Attachment A, pgs. 36-37). Concerning this inquiry, Court's oral ruling states: "Because the impression of the previous testimony was that [the Defendant] was somehow trying to abscond after being pursued by a police officer, and that was clearly not the case." *See* Attachment A, pg. 170. The only testimony from which this impression could have been derived is from SPD Ofc. Brook's *opinion* based on his training and experience– not a statement of absolute fact:

Motion for Reconsideration and Re-Opening of Suppression Hearing - 14

the "large" amount of currency was suspiciously bundled consistent with his training and experience as related to drug trafficking and SPD Ofc. Brooks' testimony that he ran the Defendant's information through dispatch and learned the Defendant had a warrant for his arrest and was driving on a suspended driver's license and was on active DOC supervision. *See* Attachment A, pg. 17. The testimony also included: DOC CCO Taylor's testimony that he received a call from SPD Ofc. Brooks advising him that the Defendant was under arrest for driving while license suspended, and had "quite a large sum of cash in one of his pockets" (*see* Attachment A, pg. 47); CCO Taylor noted the fact that he had what SPD Ofc. Brooks described as a large sum of money was of significance as the Defendant was "out of work for some time", and "didn't have his own apartment" (*see* Attachment A, pgs. 48-49); CCO Taylor also noted that while the Defendant had not been tested for controlled substances beginning 4-5 weeks prior to March 28, 2017, due to a severely-contagious MRSA infection in his nose (*see* Attachment A, pg. 49-50), and that on March 21, 2017,

---

Q    And did you -- was there anything about his -- or the vehicle's turn into that alley that you found interesting or significant <u>in your opinion</u>?

A    Yeah, it appeared that the driver of the vehicle noticed my, uh, patrol vehicle making a U-turn, and the left turn was quite hasty, um, to <u>probably avoid detection</u>.

*See* Attachment A, pg. 15 (emphasis added). The United States acknowledges that this Court is the trier of fact and can conclude that the Defendant either was, or was not, attempting to abscond from law enforcement. SPD Ofc. Brooks simply testified to what he observed and why those observations were significant to him after specifically being asked his opinion or interpretation of his observations. This is the specific inquiry required by the Supreme Court. *See e.g. Arizu* 534 U.S. 266; *United States v. Cortez,* 449 U.S. 411 (1981). The Court's oral ruling appears to suggest that by testifying why the observations were significant *to him*, he was attempting to mislead the Court.

Motion for Reconsideration and Re-Opening of Suppression Hearing - 15

approximately a week prior to the traffic stop, the Defendant submitted to a controlled substance test, and it returned positive of methamphetamine. *See* Attachment A, pgs. 50, 54. The Defendant signed a "stipulated agreement" admitting to the use.[8] *See* Attachment A, pg. 54.

Further, DOC CCO Taylor testified about an incident that occurred the day prior to the traffic stop regarding a woman who was asking for DOC assistance in serving papers on the Defendant. *See* Attachment A, pg. 51. DOC CCO Taylor testified that "allegedly there was a traffic incident where Mr. Medrano did not follow through with what her expectations were as far as proving her insurance and those types of things." *See* Attachment A, pg. 51. DOC CCO Taylor noted that he did not believe he nor DOC were aware of the full details of the incident, but opined that it was potentially a new crime.[9] *See* Attachment A, pg. 51. DOC CCO Taylor also

---

[8] If the hearing is re-opened, the United States would present the Offender Report, Drug Use Admission, and Stipulated Agreement. *See* Attachment "B" at Exhibit 1. "Offender Report", "Drug Use Admission" and "Stipulated Agreement" from March 21, 2017 DOC Visit (one week prior to traffic stop). On the document, the Defendant notes he "don't remember" his address, but it is in "Spokane" with zip code "99206" and does not provide a phone number. *See* Attachment "B" at Exhibit 1 pg. 1. The Defendant also appears to have "X" out the "employer" section, and either writes a "0" or "X'" out the "amount of income earned last month" and leaves blank the section about "other sources of income" – not reporting his DSHS monies (which were proffered by the Defendant at the evidentiary hearing that he was receiving and was the "source of funds" on the March 28, 2017 traffic stop, Defense Exhibit 502). *See id.* On the next page, he states he is "homeless. *See id.* at pg. 2.

[9] The Court seemed to be concerned about DOC Ofc. Taylor's testimony concerning the Defendant possibly having committed some type of offense involving a motor

Motion for Reconsideration and Re-Opening of Suppression Hearing - 16

noted that the Defendant's girlfriend was an unemployed heroin addict. *See* Attachment A, pgs. 52-53. Both CCO Taylor and SPD Ofc. Brooks testified about the Defendant's clear change in demeanor when CCO Taylor arrived on scene. CCO

vehicle. *See* Attachment A, pgs. 63-64. If the hearing is re-opened, the United States would present the DOC Chronological Log, which notes that a third party contacted DOC in an attempt to get assistance in servicing the Defendant on another matter. The notation in the document specifically notes that the third-party indicated that the Defendant did not show up for court as required. *See* Attachment B at Exhibit 2 at pg. 2. Additionally, the United States would alleviate the Court's concerns by presenting the paperwork that the individual provided to DOC CCO Hannah Long (who was at the scene of the DOC search). She was aware of this information at the time charging the Defendant with operation of a motor vehicle without insurance, failure to reduce speed for conditions, and DWLS-3rd and his failure to come to Court and attempt to flee from the scene. *See* Attachment B at Exhibit 3 ("the defendant moved to the right shoulder and continued until he was stopped by a witness who felt the defendant was trying to get away" and Defendant was DWLS-3 at pg. 2). The narrative further notes that the Defendant's vehicle was impounded, the occupants of the vehicle that was struck went to the hospital, and the Defendant appears to have been given a court date of March 14, 2017. *See id.* This appears contradictory to the Defendant's testimony:

> Q    And when [SPD Ofc. Brooks] said you had a DWLS third, what did you say?
> A    I was in surprise. * * *

(*See* Attachment A, pg. 82).

Motion for Reconsideration and Re-Opening of Suppression Hearing - 17

Taylor also testified about an anonymous tip that was received 2-3 weeks before the incident advising the Defendant was involved in drug trafficking.[10]

B. "Reasonable Cause" Analysis:

The Court concludes that the fact that Defendant was driving on a suspended driver's license, in violation of his condition of supervision, does not trigger the search condition of his supervision because there is no "nexus" between the vehicle and the Defendant's violation, relying on Washington appellate court authority, such as *State v. Livingston*, 389 P.3d 753 (Wash. App. 2017). The Court also considered. in isolation. potential innocent explanation for the conduct deemed significant by law enforcement as well as discounted factors entirely.

According to the Supreme Court, in the context of a warrantless probation search the issue is whether or not the searching entity, whether that be the police or a probation officer, has a "reasonable suspicion" to search a probationer who is engaged in criminality. *See e.g. United States v. Knights*, 534 U.S. 112 (2001); *Samson v. California*, 547 U.S. 843 (2006).

In *United States v. Conway*, the Ninth Circuit, pre-*Knights*, noted that the Washington statute in play for the Community Corrections Officers, Rev. Code Wash. § 9.94A.631, requires "reasonable cause" to trigger the DOC statutory search condition; therefore, the statute was sufficient under the Supreme Court's standard in *Griffin v.* Wisconsin. *Conway*, 122 F.3d 841 (9th Cir. 1997), *cert. denied*, 522 U.S. 1065 (1998). The Ninth Circuit concluded such that probation searches conducted by DOC CCOs were in compliance with the Fourth Amendment. *Id. Conway* does not require further analysis of state law to determine whether, under federal law, a

---

[10] If the Court re-opens the hearing, the United States intends to call CCO Jeremy Wilson who took the call, obtained the information, and provided it to DOC CCO Taylor.

Motion for Reconsideration and Re-Opening of Suppression Hearing - 18

probation search was proper.  *See e.g. Knights,* 534 U.S. 112; *United States v. Ward*, 2012 WL 12886819 (D. Idaho) (concluding *Knights* and *Samson* made it clear there is no nexus requirement for a probation search).  This makes sense in light of the Supreme Court's direction in *Knights*, that a probationer only needs to be "unambiguously advised" of the search condition in order for the search to be reasonable and appropriate under the Fourth Amendment.  534 U.S. at 119-120 (noting no restrictions on what can be searched and for what purposes when a probation search is triggered).

In the post-*Knights* context, federal appellate courts have shifted the analysis to a balancing test to determine the reasonableness of a probation search.  The Supreme Court set the stage stating that a probationer has a diminished expectation of privacy as compared to an ordinary citizen.  *See Knights*, 534 U.S. 112 (probation status is a "salient circumstance" to the analysis).  Further, a probationer's reasonable expectation of privacy is further "significantly diminished" when the defendant's probation order "clearly expressed the search condition" of which the probationer was "unambiguously informed."  *Knights*, 534 U.S. at 119-120.  Here, the Defendant was on probation and was "unambiguously informed" that his vehicle was subject to search.  Hence, the Defendant has a "significantly diminished" expectation of privacy.

The Ninth Circuit has adopted this approach as evidenced in *United States v. Lara*, 815 F.3d 605, 610 (9th Cir. 2016); *see also United States v. Baron*, 650 Fed. Appx. 424 (2016).  The Ninth Circuit has also noted an important circumstance to the analysis is the even further reduced expectation of privacy that an individual possesses in his vehicle.  *See Baron*, 650 Fed. Appx. at 424 (citing *California v. Carney*, 471 U.S. 386, 393 (1985)).  The Ninth Circuit has noted that a probationer's significantly reduced expectation of privacy is to be balanced against the government's interest to determine if the search was reasonable.  *Lara*, 815 F.3d at 610.  The Ninth Circuit echoed the Supreme Court on this point, noting the government has significant interest

Motion for Reconsideration and Re-Opening of Suppression Hearing - 19

in the supervision of probationers and in conducting probation searches. *Id.* at 612 (citing *Knights*, 534 U.S. at 119-120). "Probation searches advance at least two related government interests – combatting recidivism and helping probationers integrate back into the community." *Id.* "These are important interests whose strength in a particular case varies depending on the degree to which the government has a specific reason to suspect that a particular probationer is reoffending or otherwise jeopardizing his re-integration into the community." *Id.*

The Supreme Court also noted in "assessing the governmental interest side of the balance, it must be remembered that 'the very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law'", noting the "recidivism rate of probationers is significantly higher than the general crime rate." *Knights*, 534 U.S. at 120 (citing and quoting *Griffin v. Wisconsin*, 483 U.S. 868, 880 (1987)). Further on the governmental interest side of the equation, the Supreme Court noted that "probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation, and possible incarceration, in proceedings in which the trial rights of a jury and proof beyond a reasonable doubt, among other things do not apply." *Knights*, 534 U.S. at 120 (citing and quoting *Minnesota v. Murphy*, 465 U.S. 420, 435 n.7 (1984)). The Supreme Court noted that the government has a "dual concern" with a probationer:

> on the one hand is the hope that he will successfully complete probation and be integrated back into the community. On the other is the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community. The view of the Court of Appeals in this case would require the State to shut its eyes to the latter concern and concentrate only on the former. But we hold that the Fourth Amendment does not put the State to such a choice. Its interest in apprehending violators of the criminal law, thereby protecting potential

Motion for Reconsideration and Re-Opening of Suppression Hearing - 20

victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen.

*Knights*, 534 U.S. at 120–21.  Accordingly, "the degree of individualized suspicion required of a search is a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable."  *Id.*  (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981) (individualized suspicion deals "with probabilities" not certainties)).  The Supreme Court continued that "[a]lthough the Fourth Amendment ordinarily requires the degree of probability embodied in the term "probable cause," a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."  *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, (1968); *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975)).  The Supreme Court concluded that "[t]hose interests warrant a lesser than probable-cause standard here.  When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable."  *Id.* at 121.

Here, the United States respectfully submits that governmental interest was significant as there was "specific reason" to suspect that the Defendant was reoffending (i.e. engaged in criminal activity), as articulated by the testimony.  As the Supreme Court has reminded, the question of "reasonable suspicion" is judged from the perspective of the law enforcement officer as he/she takes in and considers the facts, to include his training and experience.  *See e.g. Cortez*, 449 U.S. at 419-422.  In this endeavor, it is important to mind the "imperative of recognizing that, when used by trained law enforcement officer, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion."  *Id.* at 419.

Motion for Reconsideration and Re-Opening of Suppression Hearing - 21

Further, in conducting the analysis, the Supreme Court reminded that the consideration and rejection of factors, in isolation, does not take into account the "totality of the circumstances". *See United States v. Arvizu*, 534 U.S. 266, 273 (2002) (also reaffirming that officers are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person" and reminding that the reviewing court "must give due weight to factual inferences drawn by … local law enforcement officers").

Reasonable suspicion is well below probable cause, and "falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274. There is no need to rule out innocent conduct. *Id.* at 275 (noting that while it is true that an individual "slowing down after spotting a law enforcement vehicle is an entirely normal response that is in no way indicative of criminal activity … a law enforcement officer is "entitled to make an assessment of the situation in light of his specialized training and familiarity with [the area]").

Here, the Defendant was clearly informed of the probation search condition. The Defendant had a warrant for his arrest, was driving on a suspended license, was in a high crime area, had a large amount of currency on his person, which was suspiciously bundled (based on SPD Ofc Brooks and DOC CCO Taylor training and experience as related to drug trafficking) was unemployed for an extended period of time, had a positive UA for methamphetamine the week prior, there was an anonymous tip about his drug trafficking activities 2-3 weeks before the incident, and the day prior the report of a potential new law violation related to a possible hit and run. *See* Footnote 9, *supra*. Additionally, the Defendant's demeanor changed when the CCO officers arrived at the scene. Arguably, the Defendant, who had been on DOC supervision on and off since at least 2008, knew what was about to happen (i.e. search of the vehicle and ultimately discovery of firearms and drugs). Additionally, as

Motion for Reconsideration and Re-Opening of Suppression Hearing - 22

noted by the Ninth Circuit, it is important to the issue that the search was of a vehicle the Defendant was driving – illegally, which brings to the analysis and even further reduction in privacy interests. *Baron*, 650 Fed. Appx. 424 (citing *Carney*, 471 U.S. at 393). Such circumstances should warrant a constitutional probation search of the Defendant's vehicle.

II.    WITNESS CREDIBILITY FINDINGS

A.    Testimony of SPD Ofc. Brooks and DOC CCO Taylor

While the Court's written Order seems focus on the witnesses' testimony concerning the money and the safe, the Court's oral rulings appear to rely on testimony couched as "omissions" and "attempts to mislead" to discredit the witnesses' testimony in general. Respectfully, notwithstanding DOC CCO Taylor's incorrect testimony concerning the Defendant's criminal history (i.e. drug-trafficking convictions as opposed to four drug possession convictions) and his "equivocating" testimony concerning his observations about the safe and/or the box it was in, a review of SPD Ofc. Brooks' and DOC CCO Taylor's testimony indicates that in a number of inquiries with which the Court has expressed concerns, the witnesses were testifying to their *belief* or *opinion* based on training and experience as a law enforcement officer. While the trier of fact is certainly free to disagree with such belief or opinion and come to a different conclusion as to the actual facts, the United States respectfully submits that the presence of disagreement on the ultimate issue, does not mean that such *belief* (even if incorrect) or *opinion* (even if another's opinion differs) testimony is a deliberate attempt to mislead the trier of fact.

For example, SPD Ofc. Brooks testified about the facts and circumstances surrounding his traffic stop of the vehicle the Defendant was driving and why in

Motion for Reconsideration and Re-Opening of Suppression Hearing - 23

Officer Brook's *opinion*, such behavior was significant to him as a law enforcement officer.[11]

SPD Ofc. Brooks testified, he observed the vehicle in the area of 29 South Thor Street, which is a "hot spot" area for law enforcement, meaning it's a "high crime" area based on SPD's analysis of crime data[12] and that the PACT Team, which SPD Ofc. Brooks was a member, is "designated to those areas to try to curb the criminal emphasis in the area" and is further directed to go to those areas while not on patrol to see if there is any "crime afoot." *See* Attachment A, pgs. 12-13.

SPD Ofc. Brooks testified that while on patrol in this area, he observed a vehicle with no front or rear license plate attached, which is a violation of Washington State

_____

[11] The witnesses' credibility has been challenged in terms of misleading or giving the court the wrong impression. SPD Ofc. Brooks' testimony, however, was consistent with his "Affidavit of Facts" in support of the state charges against the Defendant stemming from this incident. SPD Ofc. Brooks shared his *opinion* about the Defendant trying to evade law enforcement to a fellow law enforcement officer at the scene of the traffic stop as captured in the body camera video of the incident. The body camera footage was introduced as an exhibit at the hearing. *See* Attachment B at Exhibit 4.

[12] This testimony appears to have caused some concern for the Court. If the hearing is re-opened, the United States would present a "Problem Address Package" document by the Spokane Police Department (last updated on March 22, 2017) identifying 29 S. Thor Street as a residence associated with lots of criminal activity with no limitations as to the time of day. *See* Attachment B at Exhibit 5. Further, SPD Ofc. Brooks testified that as a member of the PACT team, his job was to investigate crime and he was specifically directed to focus on that area during his patrol shift. It would not make sense to utilize this resource in this area of the city at this time (i.e. mornings) if the time of day was a determining factor on whether an area is "high crime area".

Motion for Reconsideration and Re-Opening of Suppression Hearing - 24

law, driving in the opposite direction of travel. *See* Attachment A, pg. 14. SPD Ofc. Brooks conducted a U-turn to contact the vehicle, and at that time, he observed the vehicle make a left hand turn into the alley of 29 S. Thor Street, where, as he testified, "we've had numerous drug offenses, uh, other criminal activity." *See* Attachment A, pg. 14. SPD Ofc. Brooks observed a male driver exiting the driver's seat and walking away[13] from the vehicle and it "appeared" to Officer Brooks that the driver of the vehicle had noticed his patrol car and made a "quite hasty" left turn "probably to avoid detection."[14] *See* Attachment A, pg. 15. SPD Ofc. Brooks noted that at first when he was trying to contact the driver (the Defendant), the driver "just kind of continued walking," and so Officer Brooks asked the driver to "stay right there for a second." *See* Attachment A, pg. 15.

Another example of an apparent misapprehension of the testimony is when SPD Ofc. Brooks testified that he called DOC CCO Taylor, advised DOC CCO Taylor of the arrest, and asked if DOC CCO Taylor if he wanted to come and check in with the Defendant. *See* Attachment A, pgs. 21-22. It appears that during this part of SPD Ofc. Brooks' direct, there was some confusion about the time of day the incident occurred. The Court stated in the oral ruling:

> Again, reading the briefs, I had been told that the area -- and there was testimony about where the area that Mr. Medrano was. <u>Nowhere in the briefs did it indicate what time of day this was; that this was a hot spot, an area that there was drug trafficking</u>. You know, in abstract that would be,

---

[13] The testimony was that the Defendant exited the vehicle and was walking away. SPD Ofc. Brooks was not specifically asked in what direction the Defendant was traveling away from the vehicle. The Court concluded that because the Defendant was traveling in the direction toward the oncoming unmarked police patrol vehicle, he was not attempting to abscond. *See* Attachment A at pg. 15.

[14] *See* Footnote 7, *supra*.

Motion for Reconsideration and Re-Opening of Suppression Hearing - 25

again, an important factor. Nowhere in the briefing did they tell me what time this had occurred. <u>The witnesses didn't testify about that.</u>

<u>It was only after I asked Ms. Baunsgard to ask the witnesses to provide the chronology and time did they, in fact, admit that this was happening at 9 o'clock in the morning.</u> Not at 1 o'clock at night in a high drug-trafficking area. Again, the Court is getting the impression that I'm being misled by these witnesses.

*See* Attachment A, pg. 169 (emphasis added).

The concern is that this confusion has been weighed toward witness credibility. Notwithstanding the shortcomings of the United States' briefing, the direct testimony with SPD Ofc. Brooks was concerning the general time of day (i.e. morning) occurred *prior* to the Court's inquiry:

Q    And did you speak to Mr. Taylor that evening?
A    Yes.
Q    And did you -- or excuse me. <u>It was the morning</u>. My apologies –
A    <u>Yes</u>.
Q    -- that's my misstatement. Did you let him know what was going on and what you observed?

*See* Attachment A, pg. 22. Not only did the United States illicit time of day testimony, the AUSA apologized for initially using the term "evening." Presumably, this is what contributed to the Court's confusion, which it asked the United States to address:

THE COURT:    Counsel, I also am not clear on the time on any of these events –
[AUSA]:    Oh.
THE COURT:    -- either the arrest -- or, excuse me, the detention, the initial contact, the time of the probation officer arriving. If you could just clarify that point for me, that would be helpful.
[AUSA]:    Absolutely. My apologies.
THE COURT:    Thank you.

[AUSA]:    (Continuing)

Motion for Reconsideration and Re-Opening of Suppression Hearing - 26

> Q    And -- okay. We'll just kind of start at the beginning and work chronologically with the time fashion. <u>Approximately when</u> did you observe that white or light-colored Cadillac driving?
>
> A    Uh, I want to say it was <u>a little after 9:30 in the morning</u>. Um –
>
> Q    Is that an approximation?
>
> A    Approximately.
>
> Q    And so was it safe to say you pulled him over -- or that vehicle over approximately at that time?
>
> A    Yes.
>
> Q    Let's see. And approximately what time did you discover that -- or did dispatch advise that there was a warrant for his arrest?
>
> A    Uh, let's see, probably around closer to 9:40. We were talking outside the car.

*See* Attachment A, pgs. 23-24 (emphasis added).  As such, based on review of the transcript, the Court's impression that it was being misled concerning the time of day should not be held against the witness, as the witness had not testified as to any other time of day or evening other than "morning." *See* Attachment A, pgs. 22-24.  As a witness cannot answer a question unless it is asked, the misapprehension should be attributed to the United States' lack of specific inquiry (beyond "morning"), rather than the witness' failure to volunteer the approximate time of day.

After cross-examination, re-direct, and re-cross-examination, the Court inquired as to whether SPD Ofc. Brooks had turned his lights and sirens on (he testified that had not) (*see* Attachment A, pg. 37); and whether the vehicle had pulled into a "parking spot" or in an alley (SPD Ofc. Brooks said that the vehicle wasn't blocking the alley, but wasn't in a parking stall either).  *See* Attachment A, pg. 23.  Testimony was drawn out on the Court's inquiry, it should be noted that SPD Ofc. Brooks had not been asked whether he had initiated his lights and siren, nor had he testified to the contrary.

During his testimony, DOC CCO Taylor also detailed his knowledge of the location of the incident, 29 S. Thor Street, and stated that based on his experience it was a "very high drug-trafficking area" with "multiple violent offenses," including an

Motion for Reconsideration and Re-Opening of Suppression Hearing - 27

attempt to shoot a deputy a couple weeks prior to the incident. *See* Attachment A, pgs. 54-55. DOC CCO Taylor noted again that a large sum of currency being found on the person of the Defendant was of significance *to him*, based on the Defendant was out of work and as DOC CCO Taylor testified, he *believed* the Defendant had "a prior drug trafficking conviction." *See* Attachment A, pg. 55.

> In its oral ruling, the Court stated:

> I want to go through Officer Taylor's testimony as supporting the reasons that he believed he had the right to search this vehicle.

> He testified that Medrano had a large sum of cash in his pocket, which Officer Taylor explained was unusual, given the fact that he was unemployed and didn't have housing. And then he said that, oh, this was consistent with drug trafficking, and -- oh, his history of drug trafficking, is what his testimony was. When pressed upon that, he was then equivocating. There is no evidence that Mr. Medrano had a history of drug trafficking. None. There was a question by Ms. Baunsgard: Isn't it true that in Idaho you were charged with this? The answer was "no."

*See* Attachment A, pg. 166 (emphasis added). In its written Order, the Court states:

> Most importantly, Officer Taylor seriously misrepresented or misremembered Mr. Medrano's criminal history. Officer Taylor testified he could not specifically recall Mr. Medrano's past criminal convictions, but he believed Mr. Medrano had at least one drug trafficking conviction. In fact, there was no evidence presented to the Court that Mr. Medrano was ever convicted of, or even charged with, any type of drug trafficking. Mr. Medrano's only drug-related charges or convictions this Court is aware of are for possession. Although an officer's misunderstanding of a suspect's criminal history does not necessarily render a search unconstitutional, *see United States v. Cotterman*, 709 F.3d 953, 968 (9th Cir. 2013), the discrepancy here goes to the reliability of Officer Taylor's overall recollection of the circumstances surrounding the stop and search.

*See* ECF Doc. No. 56, pg. 20 (emphasis added).

The first concern is the Court's finding that the witness "equivocation" in his answer denotes an intent to mislead the Court, rather than a mistaken belief that concerning the Defendant's extensive criminal history. During the actual testimony,

Motion for Reconsideration and Re-Opening of Suppression Hearing - 28

DOC CCO Taylor did initially testify, incorrectly that "[the Defendant] has a prior conviction for trafficking in narcotics." *See* Attachment A, pg. 55. On cross-examination, when counsel indicated that the Defendant had only been convicted of possession, although CCO Taylor expressed his uncertainty due to not having because the Defendant's prior convictions were "not in front of [him]," CCO Taylor maintained that he "*believes* [the Defendant] does have intent to deliver, trafficking convictions, but . . . ." *See* Attachment A, pg. 62 (emphasis added, but ellipsis in transcript).

The second concern is the inference that the United States' inquiry to the Defendant concerning being charged with drug trafficking charges was in bad faith or a further attempt to mislead the Court. There appears, however, to already be a suggestion in this case (and filing on the record in this case) that the Defendant had previously been charged with what appears to be a trafficking offense. *See* ECF Doc. No. 9 (Pretrial Services Report stating in relation to his Idaho September 2, 2011, conviction for possession of a controlled substance: "count 4, pharmacy unlawful sale, delivery or administration of prescription or legend drug, w[as] dismissed on September 2, 2011").

The third concern is that while DOC CCO Taylor testified to his incorrect *belief*, this Court seems to concluded that the colloquy was intended "to begin to mislead this Court and give the Court the wrong impression." *See* Attachment A, pg. 167. The United States concedes that DOC CCO Taylor got it wrong. Respectfully, however, the United States submits that there is a difference between truthful testimony to an incorrect belief and a deliberate motive to testify falsely to the Court. In this case, the Defendant tested positive – and admitted methamphetamine use – just one week prior to the arrest/search, (*see, infra*), and has a significant history of *possession* and *use* of controlled substances, both of which factors weigh toward justifying a DOC search. As such, CCO Taylor would have no motive to mislead the

Motion for Reconsideration and Re-Opening of Suppression Hearing - 29

Court as to his belief regarding the Defendant's criminal history. In short, the United States submits that the actual criminal history and recent drug use is significant enough without a need to mislead the Court. DOC CCO Taylor testified that he advised his supervisor, Josh Wolff, an 18-year veteran of DOC, of the facts, and CCO Wolff approved a DOC search. *See* Attachment A, pg. 55. According to the testimony, CCO Taylor's DOC supervisor authorized the DOC search upon the information provided to him prior to CCO Taylor even arriving on the scene. However, according to CCO Taylor's testimony, once he did arrive on scene, he spoke to SPD Ofc. Brooks and the other officer that was at the scene and "again went over the pieces of the puzzle that were there." *See* Attachment A, pg. 56. DOC CCO Taylor testified that he noted "in the front passenger seat" was a "rectangular, gray-style safe" and "from my experience and training, um, I've always discerned those to contain some sort of, you know, either narcotic or firearm." *See* Attachment A, pg. 56. DOC CCO Taylor agreed it certainly aroused his curiosity and informed on his "totality of analysis of the situation." *See* Attachment A, pg. 57. DOC CCO Taylor further detailed that he discussed the bundling of the currency with Officer Brooks – again, detailing that Officer Brooks advised "it was packaged in a large sum in a rubber band, which is uncommon as well." *See* Attachment A, pg. 58. DOC CCO Taylor also noted discussion about the Defendant's driving status with SPD Ofc. Brooks, so he "knew [the Defendant] was DWLS" and noted that he also knew that "[the Defendant] had a recent citation for DWLS a month or so prior to that, or a short time prior to that" based on the review of the Defendant's chronology. *See* Attachment A, pg. 58. DOC CCO Taylor advised that based on all the factors and his own training and experience, he believed the Defendant was violating the terms if his supervision and evidence of such would be located in the Defendant's vehicle. *See* Attachment A, pg. 59.

Motion for Reconsideration and Re-Opening of Suppression Hearing - 30

On cross-examination, DOC CCO Taylor was asked if he knew if the Defendant had been to the DOC offices that morning, and DOC CCO Taylor advised he was aware now, but was not aware[15] of that at the time as "they had not entered that chorological entry at that point in time" and such orientation would have been in a "different office." *See* Attachment A, pg. 62. When DOC CCO Taylor was questioned about whether the Defendant had previous drug *trafficking* convictions, and DOC CCO Taylor stated "I'm not sure. It's not in front of me. But I *believe* he does have intent to deliver, trafficking conviction." *See* Attachment A, pg. 62. The Court questioned DOC CCO Taylor about the third-party service incident, which according to the DOC Log, occurred on March 27, 2017, and DOC CCO Taylor advised he was not there, and was just going off his recollection of the chronological log. *See* Attachment A, pg. 64; *see also* Footnote 9, *supra*.

In fairness, neither SPD Ofc. Brooks' nor DOC CCO Taylor's testimony was without flaw. First, when the Court inquired of SPD Ofc. Brooks about the safe in the front seat, SPD Ofc. Brooks agreed that he did not say it was in a box previously, and agreed with the Court that it would have been "more accurate" to say it was in a cardboard box.[16] *See* Attachment A, pgs. 131-132. Second, in addition to his mis-

---

[15] If the hearing is re-opened, the United States would present the DOC Log (printed September 12, 2017) that still does not indicate that the Defendant appeared for Work Crew Orientation on the morning of March 28, 2017. *See* Attachment B at Exhibit 2 pg. 2.

[16] This begs the questions as to how much detail is required when SPD Ofc. Brooks correctly testified that he observed a safe in the front seat of the vehicle, (*see* Attachment A, pg. 21), and the Defendant's testimony corroborated the fact that the safe was visible because the top of the cardboard box was open. *See* Attachment A, pg. 107. If the safe was in fact visible, as the Defendant admitted, the object was

Motion for Reconsideration and Re-Opening of Suppression Hearing - 31

belief concerning the Defendant's prior drug felony convictions, DOC CCO Taylor equivocated as to his recollection of whether he observed the safe in the front seat of the vehicle. When asked on rebuttal to further describe the safe in the front passenger seat, DOC CCO Taylor stated it was encased in a cardboard box, and he "believed" the top of the box was open. *See* Attachment A, pgs. 120. DOC CCO Taylor advised he could not recall if he observed the safe inside the box before the passenger door was opened, but was sure that he could see there was a safe in the box after the vehicle door was open. *See* Attachment A, pg. 120. The Court then asked the United States to clarify. *See* Attachment A, pgs. 120-121. DOC CCO Taylor indicated that he could not recall. *See* Attachment A, pg. 121. The Court then inquired:

THE COURT:      Officer, I do have a question. Earlier you testified in this case how you conducted the search.

THE WITNESS:    No, there wasn't a reason I didn't clarify that.

THE COURT:      It was just because you know the information so clearly, maybe you just left that out?

THE WITNESS:    Yeah, I wasn't even thinking about that.

THE COURT:      Okay. And so there were two safes; is that correct?

THE WITNESS:    Yes, sir.

THE COURT:      The safe that was in the front you did not see, is that correct, until you opened the door?

THE WITNESS:    I can't 100-percent remember, to be honest.

THE COURT:      Okay. The safe in the back you never saw until you opened the door.

THE WITNESS:    Not until the car door was opened, no.

---

correctly identified. The follow-up question is whether if the safe was partially wrapped in a jacket or visible in an open gym bag, rather than its retail box, would it have weighed more toward the reasonable cause determination. Ofc. Brooks phrased the safe issue in terms of one of the piece of the puzzle, not in an absolute: " … the amount of currency he had on him, um, disassociating yourself with the vehicle, and then seeing the safe in the vehicle, um, it was kind of odd." *See* Attachment A pg. 21.

Motion for Reconsideration and Re-Opening of Suppression Hearing - 32

THE COURT:      Okay. Okay. All right. Thank you.  Is there a reason that you did not clarify that the safe -- first of all, that there were two safes?

THE WITNESS:    No, there wasn't a reason I didn't clarify that.

THE COURT:      It was just because you know the information so clearly, maybe you just left that out?

THE WITNESS:    Yeah, I wasn't even thinking about that.

THE COURT:      Okay. And so there were two safes; is that correct?

THE WITNESS:    Yes, sir.

THE COURT:      The safe that was in the front you did not see, is that correct, until you opened the door?

THE WITNESS:    I can't 100-percent remember, to be honest.

THE COURT:      Okay. The safe in the back you never saw until you opened the door.

THE WITNESS:    Not until the car door was opened, no.

THE COURT:      Okay. Okay. All right. Thank you.

*See* Attachment A, pgs. 123-124.

After this Court stated that the fact there was "confusion" was because DOC CCO Taylor had "decided [[17]] to mislead the Court based on the testimony he provided," (*see* Attachment A, pg. 151 (emphasis added)), DOC CCO Taylor was

---

[17] If the witness in fact deliberately "decided" to mislead the Court, he was inconsistent in even this conduct.  DOC CCO Taylor initially testified that he observed the safe in the front seat. *See* Attachment A, pg. 57.  DOC CCO Taylor subsequently testified that he could not recall "100-percent" if he observed the safe in a box before the door was opened. *See* Attachment A, pg. 120.  Finally, DOC CCO Taylor testified that upon review of his report, he recalled observing the gray-colored safe in the box from outside the vehicle. *See* Attachment A, pg. 153.  Arguably, this testimony is neither completely contradictory nor evidence of a deliberate attempt to mislead the Court.  In short, if the witness had decided to mislead the Court, why would he not have simply held fast to his initial testimony or choose to testify to something that could not be so easily disproven?

Motion for Reconsideration and Re-Opening of Suppression Hearing - 33

recalled to the stand. DOC CCO Taylor was asked if he had the opportunity to review his report since the time of his testimony the previous day, where he had expressed the fact he was not "100-percent" sure whether he saw the open box containing the safe before or after he began the search. *See* Attachment A, pgs. 152-153. DOC CCO Taylor stated that based on his review of his report, he saw the box and inside the box he could see a gray-colored safe from outside of the vehicle. *See* Attachment A, pg. 153. DOC CCO Taylor was asked why he did not more specifically articulate during his initial testimony that the safe was in a box, and DOC CCO Taylor advised that, to him, it did not have an evidentiary value so he did not think about that when he was testifying, as his focus, and what was important to him, was the fact there was a safe in the vehicle. *See* Attachment A, pg. 154. DOC CCO Taylor advised that the fact the safe was in a box did not change its significance to him. *See* Attachment A, pg. 154. DOC CCO Taylor stated he was not trying to mislead the Court, the fact it was in a box was just not important to him.[18] *See* Attachment A, pg. 154.

Of further concern is the Court's comments concerning its "misimpression" that the Defendant was "not in compliance with his DOC supervision." *See* ECF Doc. No. 56, pg. 20. The Court's written Order states:

---

[18] The notes in its written Order that "even [DOC CCO Taylor's] third statement is inconsistent with the report itself, which does not mention a box." *See* ECF Doc. No. 56, pg. 19. While the existence of the cardboard box is clearly important to the Court, it was apparently not important to any of the witnesses, including the Defendant, which is evidenced by the lack of reference to the cardboard box in DOC CCO Taylor's report, the lack of this detail in the United States' witnesses' direct testimony, the lack of cross-examination on this fact by defense counsel, and the fact that after multiple inquiries, the Defendant ultimately testified that the cardboard box was open and the safe was visible, which was clearly against his own interest.

Motion for Reconsideration and Re-Opening of Suppression Hearing - 34

Officer Taylor's initial testimony also left the Court with the misimpression that Mr. Medrano was not in compliance with his DOC supervision. Specifically, Officer Taylor did not mention, and later claimed to be unaware, that Mr. Medrano had in fact provided a residence where he would be living about a month before this incident. Similarly, Officer Taylor also did not mention, and later claimed he was unaware, that Mr. Medrano had been at the DOC office for a work orientation immediately before this incident occurred. Officer Taylor also omitted that Mr. Medrano was in compliance with his supervision on the date he was arrested and that he was scheduled to be off supervision in two weeks.

*See* ECF Doc. No. 56, pgs. 20-21.

The Court's oral ruling appears to attribute omissions in testimony about the status of the Defendant's supervision toward the credibility finding. For example, the Court stated that DOC CCO Taylor

never mentioned the fact that [the Defendant] had two weeks left on his probation; didn't say probation was extended; didn't say that, in fact, the morning of this arrest, [the Defendant] had been in the DOC office that morning doing orientation for those work crew hours. Didn't say one bit. Says later on, when we're calling him back, that he just simply didn't know that. Yet his testimony was that he was -- whenever he testified about something about Mr. Medrano, he says, no, I reviewed the log; I reviewed the log; I had that information. Again, I have a question about Mr. Taylor's recollection here.

*See* Attachment A, pgs. 168-169. DOC CCO Taylor did testify that the Defendant was on DOC supervision *at the time* on two separate DOC files, one for Theft of Stolen Property and other Drug Possession. The Defendant confirmed that he was on DOC supervision at the time. Arguably, whether his term of community supervision was scheduled to end in six months, two weeks, or even later that day, is not relevant and, thus, the lack of mentioning the ending date – or whether the Defendant had checked into a DOC office earlier that day – should not be counted against the witness as a material omission designed to mislead anyone, especially if he was not asked these questions. The simple fact is that the Defendant was under DOC supervision (a

Motion for Reconsideration and Re-Opening of Suppression Hearing - 35

fact of which he admitted lying about three times to SPD Ofc. Brooks) and subject to the terms of such supervision at the time of the incident.

III.    RECONSIDERATION OR RE-OPENING OF THE HEARING

A. Reconsideration of Suppression and Credibility Findings:

The United States respectfully requests this Court to reconsider the reasonable cause determination based on the following: (1) the Defendant in fact possessed a large sum of cash (in this case $3,273), which although SPD Ofc. Brooks did not count it at the scene, would have appeared to be a large amount;[19] and (2) the safe on the passenger seat was visible because the top of the cardboard box as open allowing SPD Ofc. Brooks to actually see the safe.  First, the Court has suggested that knowledge of the exact amount of money – rather than what appeared to a law enforcement officer, based on his training and experience, to be consistent with drug trafficking – is a significant factor.  If this is the case, the Court's suppression of the search provides no guidance to law enforcement officers as to the exact amount that crosses the threshold of suspicious conduct.[20]  Second, the Court suggests that the fact that the safe was in its "retail box" is a significant factor.  Again, however,

---

[19] Apparently, the Defendant attempted to explain the "large" amount of cash by telling his girlfriend who had arrived at the scene, in a voice loud enough for SDP Ofc. Brooks to hear, "Hey, I have the money for the car I just sold for you."  *See* Attachment A, pg. 19.  Regardless of the veracity of the Defendant's self-serving statement, the amount of money was such that the Defendant tried to explain it through the sale of a vehicle before being asked.

[20] The Court notes that "it could have been $400, could have been $200, could have been a thousand, and it could have been $3,500, as it was in this case."  *See* Attachment A, pg. 167.   The operative question for law enforcement is, "how much is a suspicious amount?"

Motion for Reconsideration and Re-Opening of Suppression Hearing - 36

notwithstanding the fact that the Defendant himself testified that the actual safe was visible, the Court's suppression of the search provides no guidance to law enforcement officers as to how to determine whether an item that is otherwise legal to possess is suspicious based on how it is or is not packaged.[21]

If the fact that the actual amount of money was unknown, and the fact that the safe was in an open cardboard box are not in themselves dispositive factors in weighing the reasonable cause for the DOC search, the United States submits that other factors presented during the hearing and discussed herein support the DOC search. Alternatively, if the money and the cardboard box are dispositive, regardless of other circumstances presented by the witnesses, the United States respectfully urges the Court the reconsider the testimony of SPD Ofc. Brooks and DOC CCO Taylor. The United States concedes that the testimony was less than perfect and at times incorrect. The United States respectfully submits, however, that upon review of the transcript of testimony, the witnesses' testimony, though flawed at times, does not evidence a deliberate decision to attempt to mislead the Court.

B. Re-Opening of the Hearing:

Based on the Court's oral rulings and written Order, it appears that credibility may be, at least in part, based on the United States' failure to present corroborating, extrinsic evidence of the background testimony. If this Court were to indulge re-opening the suppression hearing, even if the ultimate decision is not affected, the

---

[21] For example, if officers were able to observe multiple boxes of baking soda through a translucent, plastic grocery bag, are they permitted to weigh this circumstance as a factor toward reasonable suspicion or even probable case of crack-cocaine manufacturing or trafficking activity? Or, does the baking soda – or in this case the safe – have to be removed from its packaging to become suspicious?

Motion for Reconsideration and Re-Opening of Suppression Hearing - 37

United States would be prepared to address the specific corroboration issues the Court raised.

First, the Court seemed to be concerned about the testimony that the area in which the incident occurred was a designated high-crime area. If the hearing is re-opened, the United States would present a "Problem Address Package" document by the Spokane Police Department (last updated on March 22, 2017) identifying 29 S. Thor Street as a residence "associated with lots of criminal activity." *See* Attachment B, Exhibit 5.

Second, the Court seemed to be concerned about DOC CCO Taylor's testimony that the Defendant tested positive for controlled substances just one week prior to the incident. If the hearing is re-opened, the United States would present a DOC Offender Report with a signed by the Defendant admitting to using methamphetamine on March 20, 2017, and Morphine on March 19, 2017. *See* Attachment B, Exhibit 1.

Third, the Court seemed to be concerned about DOC CCO. Taylor's testimony that although he had reviewed the DOC files, he was not aware that the Defendant had appeared to work-release orientation on the same morning of the incident. If the hearing is re-opened, the United States would present a print-out of the DOC files encompassing the time period of February 27, 2017, through March 30, 2017. The document does not note a record of the Defendant attending Work Crew Orientation.[22] *See* Attachment B, Exhibit 2.

Fourth, the Court seemed to be concerned about the testimony of DOC CCO Taylor concerning the Defendant possibly having committed some type of offense

---

[22] This does not mean the Defendant did not attend the Work Crew Orientation on March 28, 2017, as he testified. It is proffered simply as corroboration to DOC CCO Taylor's testimony that he did not have that information upon reviewing the file on March 28, 2017.

Motion for Reconsideration and Re-Opening of Suppression Hearing - 38

involving a motor vehicle. If the hearing is re-opened, the United States would present the same DOC report referenced above, as well as the documents that were given by the individual and DOC CCO Hannah Long who was at the search scene. *See* Attachment B, Exhibit 3.

In addition to the above, the United States would proffer that there were photographs taken at the scene depicting how the safe appeared in the box in the front seat of the vehicle. *See* Attachment B, Exhibit 6. Although the testimony would be that the box and safe were initially removed from the inside of the vehicle and placed on the top of the vehicle, the box with the safe inside were replaced back in the vehicle in the exact same positon for the photograph it in a consistent location as testified to by all the witnesses. Notwithstanding the Defendant's own testimony that the top of the box was open and the safe was visible, the United States was remiss in not presenting this photograph as an exhibit. The United States would also play for the Court the body camera video of the scene which was already admitted as evidence. *See* Attachment B, Exhibit 4.

## CONCLUSION

A law enforcement officer's credibility is paramount to his or her ability to serve the public. Law enforcement officers are also human; they make mistakes, they do not always write reports or testify perfectly. Here, the United States respectfully submits that the Court appears to have based its credibility finding, at least in part, in the lack of answers to questions that were ***not*** asked by the United States and failure to present corroborating, intrinsic evidence in support of the witnesses' testimony. For this reason alone, the United States respectfully requests that this Court re-open the

//

//

//

//

Motion for Reconsideration and Re-Opening of Suppression Hearing - 39

suppression hearing (or at a minimum review the transcript and the exhibits provided here and re-consider its credibility findings), as well as the Court's ultimate conclusion concerning the suppression of the evidence.

Dated: October 13, 2017.

JOSEPH H. HARRINGTON
Acting United States Attorney

*s/ Caitlin Baunsgard*
Caitlin Baunsgard
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Walter Ayers: Walter@ayerslawfirm.net

*s/ Caitlin Baunsgard*
Caitlin Baunsgard
Assistant United States Attorney

Motion for Reconsideration and Re-Opening of Suppression Hearing - 40